# UNITED STATES DISTRICT COURT
# DISTRICT OF IDAHO

| | |
|---|---|
| DEPUY SYNTHES SALES, INC., <br><br> Plaintiff, <br><br> vs. <br><br> RICHARD WILLIAMS, <br><br> Defendant, | Case No.: 1:17-cv-00404-REB <br><br> **MEMORANDUM DECISION AND ORDER RE: PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION (DKT. 3)** |

Pending is Plaintiff's Motion for Preliminary Injunction (Dkt. 3). Having carefully considered the record, heard oral argument, and otherwise being fully advised, the undersigned enters the following Memorandum Decision and Order:[1]

## SUMMARY OF DECISION

Plaintiff's Motion for Preliminary Injunction is DENIED for failure to make a clear showing of likely success on the merits and for failure to make a clear showing of likely irreparable harm absent preliminary injunctive relief.

## BACKGROUND

Plaintiff DePuy Synthes Sales, Inc. ("DePuy") seeks a preliminary injunction barring Defendant Richard Williams ("Williams") from taking actions that DePuy contends violate a non-competition agreement he signed when he began employment with DePuy. Williams is now working for Steelhead Surgical, Inc. ("Steelhead"), a competitor of DePuy.

---

[1] Following expedited briefing, oral argument took place on October 26, 2017.

**MEMORANDUM DECISION AND ORDER RE: PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION – 1**

Through its Mitek Sports Medicine division,[2] DePuy designs, manufactures, and sells medical devices and instruments for the diagnosis and treatment of soft tissue joint injuries and conditions in the market for arthroscopic and sports medicine devices, instruments, and tools. Decl. of Stephen Stranzl ¶ 3 (Dkt. 3-6) ("Stranzl Decl."). These products are used, as may be appropriate, in orthopedic surgeries involving the shoulder, elbow, hand, wrist, hip, knee, and ankle. *Id.* ¶ 4. Orthopedic surgeons use them to diagnose and treat various joint injuries or conditions such as ACL reconstruction and meniscus and rotator cuff repair. *Id.* The customers involved in buying such devices are primarily orthopedic surgeons, the medical centers where they perform procedures, and employees involved with purchasing medical devices. *Id.*

DePuy hired Williams as an associate sales consultant in June 2015. *Id.* ¶ 7. In that role, according to DePuy, Williams "covered surgical cases in his territory, participated in sales strategy for his territory, and served as one of the faces of DePuy Synthes products for the customers in his territory." *Id.* Prior to starting with DePuy, and as a condition of his employment, Williams signed an Employee Secrecy, Intellectual Property, Non-Competition and Non-Solicitation Agreement (the "Employee Secrecy Agreement"). *Id.* In broad terms, the Employee Secrecy Agreement purports to prohibit Williams from competing with DePuy for 18 months after the termination of his employment with DePuy. *See generally* Employee Secrecy Agreement (Dkt. 1-1). The parties dispute the enforceability and scope of the Employee Secrecy Agreement.

---

[2] The named plaintiff, DePuy Synthes Sales, Inc., has three divisions in the Boise area which service and sell devices and products into different surgical markets: Mitek, Synthes, and DePuy. Williams Decl. ¶ 9 (Dkt. 15-1). Each sells medical devices targeted toward a particular market of surgery or procedures. *Id.* For purposes of this Memorandum Decision and Order, all three of the divisions, as well as the named plaintiff itself, are referred to as DePuy.

As a DePuy sales representative, Williams worked in the Boise area. Stranzl Decl. ¶ 9 (Dkt. 3-6). He worked primarily with 10 DePuy customer accounts, which are the same customer accounts DePuy now seeks to enjoin Williams from contacting on Steelhead's behalf.[3] His responsibilities included attending surgeries and providing DePuy medical devices when asked. Decl. of Richard "Jake" Williams ¶ 21 (Dkt.15-1) ("Williams Decl."). Williams likens his role to that of a golf caddy, handing equipment to the professional upon request. *Id.* Most of Williams's work involved knee surgeries, but he also had connections to some shoulder surgeries and he observed some hand surgeries. *Id.* ¶¶ 20, 23.

The parties dispute the circumstances of Williams's departure from DePuy. Williams claims he was shown the door after being led to believe by his supervisor, Bob Davis, and the regional manager, Stephen Stranzl, that his job was in jeopardy. *Id.* ¶¶ 26, 27, 29. Davis and Stranzl both claim that Williams's job at DePuy was not in jeopardy and that nobody at DePuy suggested to Williams that it was. Supplemental Decl. of Stephen Stranzl ¶¶ 15–17 (Dkt. 21-1) ("Stranzl Supplemental Decl."); Decl. of Robert "Bob" Davis ¶¶ 14–16 (Dkt. 21-2) ("Davis Decl."). Regardless, on August 28, 2017 Williams submitted his notice of resignation, effective September 11, 2017. Stranzl Decl. ¶ 18 (Dkt. 3-6). On September 11, 2017, Williams began working at Steelhead. Williams Decl. ¶ 31 (Dkt. 15-1).

Steelhead distributes sports medicine devices manufactured by Arthrex. DePuy considers both Steelhead and Arthrex competitors. Stranzl Decl. ¶ 18 (Dkt. 3-6). Orthopedic surgeons in

---

[3] These 10 accounts are Treasure Valley Hospital, St. Alphonsus Boise, St. Alphonsus Ontario, St. Luke's Boise, St. Luke's Meridian, St. Luke's Wood River, St. Luke's Surgery Center – North Robbins Road, St. Luke's Orthopedic Surgery Center – River Street, West Valley Medical Center, and Idaho Surgery Center.

**MEMORANDUM DECISION AND ORDER RE: PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION – 3**

the Boise area commonly use products from both DePuy and Steelhead/Arthrex, sometimes even during the same surgery. Williams Decl. ¶¶ 33, 38–39.

DePuy concluded that Williams intended to represent Steelhead in the same customer accounts he serviced for DePuy. DePuy's counsel sent Williams a letter demanding he comply with the Employee Secrecy Agreement. Decl. of Christopher M. Lindstrom ¶ 2 (Dkt. 3-2); *see also* (Dks. 3-3). When Williams began representing Steelhead to DePuy customers, DePuy's counsel sent a cease and desist letter. Decl. of Christopher M. Lindstrom ¶ 4 (Dkt. 3-2); *see also* (Dkt. 3-5). Subsequently, DePuy filed this lawsuit and now moves for a preliminary injunction. Subject matter jurisdiction exists under 28 U.S.C. § 1334, as the diversity and amount-in-controversy requirements are satisfied.

## DISCUSSION

### A. Legal Standards

Preliminary injunctions are governed by Federal Rule of Civil Procedure 65. "A preliminary injunction is an extraordinary remedy never awarded as of right." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008). A party seeking a preliminary injunction must establish that (1) it is likely to succeed on the merits; (2) it is likely to suffer irreparable harm in the absence of preliminary relief; (3) the balance of equities tips in his favor; and (4) an injunction is in the public interest. *Id.* at 20. The court may apply a sliding scale test, under which "the elements of the preliminary injunction test are balanced, so that a stronger showing of one element may offset a weaker showing of another." *Id.* However, the party seeking a preliminary injunction must carry its burden of persuasion by a "clear showing" of the four required elements. *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (per curiam); *Lopez v. Brewer*, 680 F.3d 1068, 1072 (9th Cir. 2012) (a "preliminary injunction is an extraordinary and

drastic remedy, one that should not be granted unless the movant, by a clear showing, carries the burden of persuasion") (quoting *Mazurek*, 520 U.S. at 972).

**B. A Preliminary Injunction Is Not Warranted.**

    1. <u>DePuy Has Not Clearly Shown A Likelihood of Success on the Merits.</u>

To succeed on its motion for preliminary injunction, DePuy must demonstrate it is likely to succeed on the merits of its claims. DePuy alleges Williams is liable for breaching the Employee Secrecy Agreement. To evaluate whether DePuy is likely to succeed on this claim, the Court must first determine what law governs the Employee Secrecy Agreement.

    *a. New Jersey Law Applies to the Employee Secrecy Agreement.*

A federal district court sitting in diversity must apply the forum state's choice of law rules to determine the controlling substantive law. *Fields v. Legacy Health Sys.*, 413 F.3d 943, 950 (9th Cir. 2005). Idaho, the forum state, applies the Restatement (Second) of Conflict of Laws, including section 187 thereof. *Carroll v. MBNA America Bank*, 220 P.3d 1080, 1084 (Idaho 2009). In pertinent part, that section of the Restatement provides:

(1) The law of the state chosen by the parties to govern their contractual rights and duties will be applied if the particular issue is one which the parties could have resolved by an explicit provision in their agreement directed to that issue.
(2) The law of the state chosen by the parties to govern their contractual rights and duties will be applied, even if the particular issue is one which the parties could not have resolved by an explicit provision in their agreement directed to that issue, unless either
    (a)     the chosen state has no substantial relationship to the parties or the transaction and there is no other reasonable basis for the parties' choice, or
    (b)     application of the law of the chosen state would be contrary to a fundamental policy of a state which has a materially greater interest than the chosen state in the determination of the particular issue . . .

RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 187 (AM. LAW. INST. 1971).

The Employee Secrecy Agreement "will be governed by and interpreted according to the laws of the State of New Jersey, without regard to its conflict of law rules." Employee Secrecy

Agreement ¶ 19 (Dkt. 1-1). Hence, DePuy contends that the parties agreed upon the application of New Jersey law, but further asserts that New Jersey and Idaho law are similar as applicable here and that the Employee Secrecy Agreement is enforceable under either state's law. Mem. in Supp. of Pl.'s Mot. for Prelim. Inj. 11 (Dkt. 3-1) ("Mem. in Supp.").

Williams argues that "Idaho is the state with the substantial relationship to the parties and to the Secrecy Agreement. Mr. Williams signed the Secrecy Agreement in Idaho, worked in Idaho, and performed his duties for [DePuy] in Idaho. He has never been to New Jersey, never traveled to New Jersey for work, and lacks any other interaction with that venue." Def.'s Opp. to Pl.'s Mot. for Prelim. Inj. 12 (Dkt. 15) ("Mem. in Opp."). By implication, Williams is arguing that New Jersey has no substantial relationship to the parties. Williams also argues it would be contrary to public policy to apply New Jersey law regarding non-competition because New Jersey's law is based on case law rather than a statutory framework.[4] *Id.* at 12–13.

Because the "particular issue" here is the enforceability of the Employee Secrecy Agreement, it would be circular to rely on section 187(1) to apply the choice of law provision contained within the very agreement whose enforceability is at issue. Thus, the choice-of-law issue cannot be resolved under subsection (1) of section 187. But it can be resolved under section 187(2). *See* RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 187(2) cmt. d (AM. LAW. INST. 1971) ("the rule of this Subsection applies when it is sought to have the chosen law determine issues which the parties could not have determined by explicit agreement directed to the particular issue. Examples of such questions are those involving capacity, formalities and substantial validity.").

---

[4] Chapter 27 of Title 44, Idaho Code, addresses "Agreements and Covenants Protecting Legitimate Business Interests." Jurisprudence from Idaho appellate courts also touches on non-competition agreements and their enforceability in Idaho.

**MEMORANDUM DECISION AND ORDER RE: PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION – 6**

Under section 187(2), the chosen law – that of New Jersey – will be applied unless an exception applies. The exception in paragraph (a) would permit the parties' chosen law to be overcome only if New Jersey "has no substantial relationship to the parties or the transaction *and* there is no other reasonable basis for the parties' choice. *Id.* § 187(2)(a) (emphasis added). Williams argues that "Idaho is the state with the substantial relationship to the parties," Mem. in Opp. 12 (Dkt. 15), but he does not argue expressly that New Jersey *lacks* a substantial relationship. Regardless, DePuy asserts that it "has a strong interest in the uniform, nationwide enforcement of its Employee Secrecy Agreement under New Jersey law," Mem. in Supp. 11 (Dkt. 3-1), which Williams does not dispute. The Court is persuaded by this argument. DePuy has established a reasonable basis for the parties to have chosen New Jersey law, satisfying the second of the two conjunctive conditions in paragraph (a). Williams, therefore, cannot overcome the choice of New Jersey law under that paragraph.

The exception in paragraph (b) presents a different scenario, in which the parties' choice of law can be overcome if applying New Jersey law would be contrary to a fundamental policy of Idaho. RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 187(2)(b) (AM. LAW. INST. 1971). Both Idaho and New Jersey enforce reasonable non-competition agreements. I.C. §§ 44-2701 through 44-2704; *Solari Indus., Inc. v. Malady*, 264 A.2d 53 (N.J. 1970). More significant here, both Idaho and New Jersey provide for judicial reformation – so-called "blue-penciling" – of unreasonably restrictive non-competition agreements to make them reasonable and therefore enforceable. I.C. § 44-2703; *Solari*, 264 A.2d at 61. Although Williams suggests that New Jersey's law on non-competition agreements is somehow contrary to Idaho policy because the applicable New Jersey law is set out in judicial cases rather than statutes, that argument is not persuasive. Williams has not shown, and the Court has not otherwise identified, that applying

New Jersey law would contravene a fundamental policy of the State of Idaho. Accordingly, Williams cannot overcome the choice of New Jersey law under paragraph (b) of section 187(2).

Because neither of the exceptions to section 187(2) applies, this Court concludes that an Idaho court would apply New Jersey law to the issue of whether the Employee Secrecy Agreement is enforceable. Therefore, the Court will apply New Jersey law to that issue. *Fields*, 413 F.3d at 950. In turn, federal law applies to the question of whether a preliminary injunction may issue.

> b. *The Employee Secrecy Agreement Can Be Blue-Penciled to Be Reasonable.*

To decide whether DePuy has shown a likelihood of success on the merits, the enforceability of the Employee Secrecy Agreement under New Jersey law must next be considered. Under New Jersey law, a non-competition agreement is enforceable "where it simply protects the legitimate interests of the employer, imposes no undue hardship on the employee, and is not injurious to the public." *Solari*, 264 A.2d at 56.

Williams argues at length that the non-competition covenants in the Employee Secrecy Agreement are unenforceable under Idaho law, without offering argument about their enforceability under New Jersey law. Mem. in Opp. 13–19 (Dkt. 15). Nonetheless, because New Jersey and Idaho law are similar, many of Williams's arguments bear consideration. His most relevant arguments are that the non-competition covenants in the Employee Secrecy Agreement are unenforceable because they are not limited to a reasonable geographic area, because they purport to prohibit him from working in any capacity in the medical industry, and because they purport to restrain him from interacting with even potential customers of DePuy. *Id.* He also argues that, even if the covenants are enforceable against him, he has not breached them. *Id.* at

19. Finally, he asserts that his superiors led him to leave DePuy and that it would be inequitable for DePuy to enforce the covenants against him after forcing him out. *Id.* at 16.

As noted above, New Jersey allows judicial reformation of non-competition agreements to limit overly-broad restrictions to make them reasonable and enforceable. *Solari*, 264 A.2d at 61. The Court does not decide today whether the applicable restrictive covenants in the Employee Secrecy Agreement are overly broad. But, assuming for the purposes of this decision they are overly broad, the Court concludes they could be made reasonable by reforming them to prohibit Williams from contacting any of the 10 customer accounts at issue with regard to any sports medicine products, including but not limited to sports medicine products used in knee surgeries. This assumption will serve as the basis for evaluating the enforceability of the Employee Secrecy Agreement for the rest of this decision.

> c. *Notwithstanding that Blue-Penciling Could be Done, the Fact Question of Whether Williams Was Forced Out of DePuy Undermines a Clear Showing of Likelihood of Success on This Record.*

The parties' declarations dispute several material facts, often directly contradicting each other. Of particular concern here is whether Williams was forced out of DePuy. This question impacts whether equitable principles might constrain the right of DePuy to enforce the restrictive covenants in the Employee Secrecy Agreement against Williams, as Williams suggests. Mem. in Opp. 16, 21, 23 (Dkt. 15).

As an initial matter, the Court is persuaded that DePuy can likely show a breach of the Employee Secrecy Agreement. Among other things, the Employee Secrecy Agreement provides that for 18 months, Williams "shall not, directly or indirectly, contact, call upon, solicit business from, sell to, or render services to, . . . any CUSTOMER" in various competitive circumstances. Employee Secrecy Agreement ¶ 7 (Dkt. 1-1). The present record contains sufficient evidence to

persuade the Court that Williams, working for DePuy's competitor Steelhead, has initiated contacts with some number of surgeons associated with the 10 DePuy customer accounts at issue. Thus, DePuy can likely show a breach of the Employee Secrecy Agreement; the Court need not consider at this time whether Williams breached in other ways.

But the analysis does not end there. Williams contends he was told by DePuy that he was a "liability" and that his "time was limited" as a DePuy employee. Williams Decl. ¶¶ 26–29 (Dkt. 15-1). He also contends he was not told about the non-competition aspects of the Employee Secrecy Agreement until after he notified DePuy that Steelhead had hired him. *Id.* ¶ 30. DePuy disputes these contentions, asserting that Williams was never told he was a liability or that his time was limited; but rather, he was told that his job with DePuy was secure. Supplemental Stranzl Decl. ¶¶ 15–17 (Dkt. 21-1); Davis Decl. ¶¶ 14–16 (Dkt. 21-2). DePuy also claims that Williams was reminded about the restrictive covenants in the Employee Secrecy Agreement prior to his departure. Supplemental Stranzl Decl. ¶¶ 20–21 (Dkt. 21-1); Davis Decl. ¶¶ 19, 21 (Dkt. 21-2). In addition, DePuy offers testimony of several other instances where it claims Williams's declarations are untrue. Supplemental Stranzl Decl. ¶¶ 2, 3, 5, 13, 14 (Dkt. 21-1); Davis Decl. ¶¶ 2, 9, 11, 12, 13, 18 (Dkt. 21-2).

Aside from DePuy's Complaint (Dkt. 1), the record in this matter consists of the briefing (with attached declarations) and oral argument on the instant motion. Williams has not filed a responsive pleading. The parties have engaged in no discovery to date. No witnesses were called at the oral argument on this motion; it was not an evidentiary hearing.

It is the nature of such things that lawsuits involve a dispute or disagreement. But the parties' dispute about a central fact of this matter – the circumstances of Williams's departure from DePuy – is remarkably stark. If DePuy's version of facts is correct, then it has clearly

shown a likelihood of success on a right to enforce the Employee Secrecy Agreement. But if Williams's version is correct, then there may exist an equitable defense against enforcement of the contract against him. The present record contains directly conflicting declarations and no discovery or other evidence.

Importantly, the Court's assessment of such facts should not be read to presume an equitable defense successfully could be raised to defeat DePuy's claim on the basis of the alleged conduct of Williams' superiors.[5] But the presence of such facts, particularly when there is no apparent implausibility to the allegations (just as there is no apparent implausibility to DePuy's denials of the same), leaves DePuy's proof short of the clear showing required for the extraordinary remedy of injunctive relief. Substantive motion practice, or trial, will determine that question. In short, DePuy has not made the clear showing required to satisfy the first element of the preliminary injunction standard.[6]

2. DePuy Has Not Clearly Shown A Likelihood of Irreparable Harm.

A party seeking a preliminary injunction also must establish that it is likely to suffer irreparable harm in the absence of preliminary relief. *Winter*, 555 U.S. 20. "A preliminary injunction will not be issued simply to prevent the possibility of some remote future injury." *Id.* (citation omitted). Irreparable injury must be *likely*, not just possible, in the absence of an injunction. *Id.* The harm cannot be speculative. *Caribbean Marine Servs. Co. v. Baldrige*, 844

---

[5] The Court has considered that Williams had been or should have been aware of the details of the Employee Secrecy Agreement from the outset of his employment. The Court also has considered DePuy's contention that part of Williams's decision to leave DePuy was based on an alleged statement by Williams that someone at Arthrex told him the agreement "was [like] Swiss cheese." Davis Dec. ¶ 19 (Dkt. 21-2).

[6] Regardless, because the Court concludes that DePuy has likewise failed to make a clear showing of the likelihood of irreparable harm, the instant motion would be denied even if DePuy had clearly shown a likelihood of success on the merits.

**MEMORANDUM DECISION AND ORDER RE: PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION – 11**

F.2d 668, 674 (9th Cir. 1988). "A plaintiff must do more than merely allege imminent harm sufficient to establish standing; a plaintiff must demonstrate immediate threatened injury as a prerequisite to preliminary injunctive relief." *Id.*; *see also Goldie's Bookstore v. Superior Ct.*, 739 F.2d 466, 472 (9th Cir.1984) (trial court's findings that plaintiff would lose goodwill and "untold" customers held speculative on appeal). Preliminary injunctions are not warranted where they are based on a generalized threat of lost revenue, market value, and goodwill. *Los Angeles Mem'l Coliseum Comm'n v. Nat'l Football League*, 634 F.2d 1197, 1202–03 (9th Cir.1980).

Significantly, "economic injury alone does not support a finding of irreparable harm, because such injury can be remedied by a damage award." *Rent-A-Center, Inc. v. Canyon Television and Appliance Rental, Inc.*, 944 F.2d 597, 603 (9th Cir. 1991). "The possibility that adequate compensatory or other corrective relief will be available at a later date, in the ordinary course of litigation, weighs heavily against a claim of irreparable harm." *Sampson v. Murray*, 415 U.S. 61, 90 (1974); *Arcamuzi v. Cont'l Air Lines, Inc.*, 819 F.2d 935, 938 (9th Cir.1987) ("temporary economic loss alone generally is not a basis for injunctive relief").

In a recent unpublished decision, the Ninth Circuit held that "[a]n enforceable noncompete agreement affords fair protection to a legitimate interest of the former employer. Thus, a breach of the agreement occasions harm. Because the harm is intangible and difficult to quantify, it qualifies as irreparable." *Ocean Beauty Seafoods, LLC v. Pac. Seafood Grp. Acquisition Co.*, Inc., 648 Fed. Appx. 709, 711 (9th Cir. 2016) (unpublished). *Ocean Beauty* relied on *Rent-A-Center* for the proposition that breach of a non-compete agreement can cause irreparable harm. *Id.* However, *Ocean Beauty* presumed, without analysis, that breach of such an agreement causes irreparable harm. *Id.* Additionally, even if it were apposite on its facts, *Ocean Beauty* is an unpublished decision and therefore is not precedent. U.S.Ct. of App. 9th Cir. Rule

36-3(a). Thus, the decision in *Ocean Beauty* does not compel an extension of the holding in *Rent-A-Center* to presume that irreparable harm is threatened per se any time a non-competition agreement is breached. A more careful review of precedent, and the particular facts of each case, is appropriate.

In *Regents of Univ. of Calif. v. Am. Broad. Cos., Inc.*, 747 F.2d 511, 519 (9th Cir. 1984), on which the court in *Rent-A-Center* relied, the trial court found a likelihood of irreparable harm after "[t]he plaintiffs described, along with supporting evidence, the numerous ways in which they would be injured." The trial court further found that, absent an injunction, the plaintiffs would be "clearly harmed . . . both monetarily and with respect to the intangibles discussed at length in argument on the motion." *Id.* After reciting this holding from the trial court, the appellate court repeated the proposition that pecuniary damages are insufficient to justify a preliminary injunction. *Id.* The court acknowledged that such a proposition "is nothing more than a corollary to the principle that the exercise of equitable jurisdiction is predicated on the absence of an adequate remedy at law." *Id.* Finally, the court examined at length the particular intangible injuries asserted in the case, concluding that the district court had not abused its discretion "in refusing to say categorically that the [threatened] injuries . . . are insubstantial, fleeting, or fully compensable in monetary terms." *Id.* at 520.

The result in *Regents* is consistent with cases in this district where courts have required evidence in support of irreparable harm. In *Sky Capital Grp., LLC v. Rojas*, 2010 WL 779561 at *3–*4 (D. Idaho March 2, 2010), the court held the movant had failed to show irreparable harm where the alleged threats of market disadvantage and loss of existing and potential customers were speculative, too generalized to be considered actual or imminent, and recoverable through a monetary award if justified. In *Herrick v. Potandon Produce, LLC*, 2016 WL 778355 at *3 (D.

Idaho Feb. 26, 2016), the court held that the movant provided no evidence supporting the "bald assertions" of irreparable harm. Further, the court held that even if the movant had provided evidence of loss of customers, misappropriation of goodwill, or disclosure of confidential information, the motion would still be denied if the losses were exclusively economic in nature. *Id.* These results are also in accord with cases from other jurisdictions requiring evidence of irreparable harm rather than broadly-framed boilerplate assertions. *See, e.g.*, *Baker's Aid v. Hussmann Foodservice Co.*, 830 F.2d 13 (2d. Cir 1987) (declining to assume irreparable harm in breach of covenant cases and upholding district court's finding of no irreparable harm based in part on plaintiff's "strong position in a highly competitive market and the quantifiable nature of any loss it might suffer because of" the breach); *First Miami Sec., Inc. v. Bell*, 758 So. 2d 1229 (Fla. Dist. Ct. App. May 24, 2000) (upholding trial court's finding of no irreparable harm on basis that evidence was available to prove actual damages, if any).

DePuy first stakes its claim of irreparable harm upon a recently-enacted Idaho statutory presumption that an employee's breach of a valid non-competition agreement threatens irreparable harm. Mem. in Supp. 17 (Dkt. 3-1) (citing I.C. § 44-2704(6)). That presumption exists under Idaho statutory law, but there is no such presumption under New Jersey law.[7] Therefore, such a presumption does not tilt the table here.

Then, DePuy argues that "irreparable injury can take the form of impairment to goodwill or disclosure of confidential information." Mem. in Supp. 17 (Dkt. 3-1). It asserts that "it would be next to impossible either to unwind or to calculate the amount of damage done to DePuy Synthes' business." *Id.* at 18. In response, Williams points out that DePuy has offered no

---

[7] *Kadi v. Massotto*, 2008 WL 4830951 (N.J. Super. Ct. App. Div. 2008), acknowledges that a company's goodwill may be protected by a non-competition agreement as a legitimate interest of the employer, but it does not support a *presumption* of irreparable harm.

**MEMORANDUM DECISION AND ORDER RE: PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION – 14**

evidence of lost sales or of customers converting to Steelhead because of Williams. Mem. in Opp. 20 (Dkt. 15). DePuy offers no evidence in reply, instead asserting that it "will not know the damage Williams does to the reputation of its products, or whether customers decide to shift business away from DePuy . . . or decide not to shift business . . . to DePuy." Reply in Supp. of Pl.'s Mot. for Prelim. Inj. 12 (Dkt. 21).

DePuy is correct in stating that threatened loss of goodwill or disclosure of confidential information can *support* a finding of irreparable harm. *Stuhlbarg Int'l Sales Co., Inc. v. John D. Brush and Co.*, 240 F.3d 832, 841 (9th Cir. 2001). But these threats do not *mandate* such a finding. On the present record, the Court is not persuaded that DePuy has clearly shown a likelihood of irreparable harm. As in *Goldie's Bookstore* and *Sky Capital Group*, the harms DePuy alleges here are speculative and too generalized to be considered actual or imminent. Unlike in *Regents*, there is no record evidence that DePuy's goodwill is threatened absent preliminary relief. Nor is there evidence that any confidential information Williams might disclose would irreparably injure DePuy. The evidence and argument presently before the Court tend to show the contrary.

The Court's assessment of such claims – that is, the argument that a loss of goodwill and disclosure of purportedly confidential information necessarily translate into irreparable harm – is appropriately placed upon the template of the market in which the various vendors (including, but not limited to, DePuy and Steelhead) compete. Here, that market consists of orthopedic surgeons conducting sports medicine surgeries with 10 medical centers confined to the Boise area. *See supra* note 3. The market is known to all, well-defined, small, and more or less closed. That is, the market consists of the same group of vendors competing for the same sales from the

same discrete and identifiable buyers.[8] Moreover, Williams alleges, and DePuy does not dispute, that "[w]hich surgeon uses which product is common knowledge in the industry." Williams Decl. ¶ 37 (Dkt. 15-1). Williams's declaration and its attachments suggest there are approximately 50 orthopedic surgeons in the Boise area who are potential customers for DePuy sports medicine products. *Id.* ¶¶ 37–41, Exs. A–C. For 35 of these surgeons, Williams even indicates whether they use DePuy, Arthrex, or other products for certain procedures. *Id.* (DePuy alleges that "[i]t is common in the industry for surgeons to switch between medical device companies." Davis Decl. ¶ 5 (Dkt. 21-2).)

Given these facts, DePuy has not met its burden to make a "clear showing" that it is likely to suffer irreparable harm absent preliminary relief. It points to no damage it has yet suffered. It speculates it could be harmed by a loss of goodwill or a disclosure of confidential information, but those conclusory assertions are unsupported by any evidence. More to the point, this is not an open-ended market where there are always more potential customers to sell to. DePuy does not sell the products at issue here to consumers. In the Boise area, DePuy's entire market is comprised of approximately 50 surgeons. Furthermore, this is a well-defined market where surgeons' product selections are common knowledge and switching between products is common. Indeed, DePuy's own declarations evidence the fact that the company keeps an ongoing assessment of the size of the market and the size of its share in the market compared to

---

[8] There is mention in the briefing and argument of the larger Treasure Valley area, with Boise in that context being the center of a metropolitan region (*e.g.*, to include Meridian, Nampa and Caldwell), and of the market extending to the St. Alphonsus medical center in Ontario, Oregon, which is economically tied to the Treasure Valley, and to the Wood River region of Blaine County, which is also economically tied to the Treasure Valley for purposes of the health care industry because the medical center is owned by the St. Luke's system based in Boise. These variations on the theme do not change the Court's larger assessment of the nature of the markets for the medical devices and the lack of a sufficient showing of irreparable harm.

**MEMORANDUM DECISION AND ORDER RE: PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION – 16**

its competitors. Supplemental Stranzl Decl. ¶¶ 4, 8–10 (Dkt. 21-1); Davis Decl. ¶¶ 11, 13 (Dkt. 21-2). In such a market, any harm DePuy might ultimately suffer, including any perceived loss of potential sales to Steelhead, is subject to proof of historical, projected, and actual sales levels. If DePuy loses no sales, it is not harmed. If it does lose sales, and the actions of Williams in violation of the Employee Secrecy Agreement are the reason for such losses, then its damages are reparable and compensable in damages. In sum, the proof that would evidence any such damages is available to DePuy.

This decision does not foreclose the possibility that DePuy might be at risk of suffering some intangible injury that would satisfy the irreparable harm prong of the preliminary injunction analysis. Nor does this decision foreclose either the possibility that DePuy could prove a claim for damages for breach of the Employee Secrecy Agreement or the possibility that such proof could support the entry of a permanent injunction, on a different record. But on the record before the Court today, DePuy has not made a clear showing that irreparable harm is likely. Its motion for preliminary injunction must therefore be denied.

3. <u>The Remaining Preliminary Injunction Requirements Need Not Be Considered.</u>

Because DePuy has not clearly shown it is likely to succeed on the merits, nor that it is likely to suffer irreparable harm absent preliminary relief, it cannot prevail on its motion for preliminary injunction. Accordingly, the other two requirements need not be considered at this time.

\ \ \

\ \ \

\ \ \

\ \ \

## ORDER

Based on the foregoing, IT IS HEREBY ORDERED that Plaintiff's Motion for Preliminary Injunction (Dkt. 3) is DENIED. A further order will issue setting this matter for a scheduling conference, with the parties to prepare appropriate litigation and discovery plans.



DATED: **November 2, 2017.**

_____
Honorable Ronald E. Bush
U. S. Magistrate Judge